IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| SAGE CHEMICAL, INC., *et al.*, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Civil Action No. 22-1302-CJB |
| ) | |
| SUPERNUS PHARMACEUTICALS, ) | |
| INC., *et al.*, ) | |
| ) | |
| Defendants. ) | |

Dominick T. Gattuso, HEYMAN ENERIO GATTUSO & HIRZEL LLP, Wilmington, DE; W. Gordon Dobie, WINSTON & STRAWN LLP, Chicago, IL; Susannah P. Torpey, WINSTON & STRAWN LLP, New York, NY; Robert A. Julian, BAKER & HOSTETLER LLP, San Francisco, CA, Attorneys for Plaintiffs.

Daniel M. Silver and Alexandra M. Joyce, MCCARTER & ENGLISH, LLP, Wilmington, DE; Erick J. Stock, Shireen A. Barday and Joshua J. Obear, GIBSON DUNN & CRUTCHER LLP, New York, NY, Attorneys for Defendants US WorldMeds Partners, LLC and USWM, LLC.

**MEMORANDUM OPINION**

June 4, 2024
Wilmington, Delaware

**BURKE, United States Magistrate Judge**

In this case, Plaintiffs Sage Chemical, Inc. ("Sage") and TruPharma, LLC ("TruPharma" and collectively with Sage, "Plaintiffs") brought antitrust-related claims against Defendants Supernus Pharmaceuticals, Inc. ("SPI"), MDD US Enterprises, LLC (f/k/a USWM Enterprises, LLC), MDD US Operations, LLC (f/k/a US WorldMeds, LLC), US WorldMeds Partners, LLC, USWM, LLC, Paul Breckinridge Jones, Herbert Lee Warren, Jr., Henry van den Berg, Kristen L. Gullo and Britannia Pharmaceuticals Limited ("Britannia"). Pending before the Court[1] is a motion to dismiss filed by Defendants US WorldMeds Partners, LLC and USWM, LLC, (collectively, the "Reorganized Entities"), pursuant to Federal Rule of Civil Procedure 12(b)(6) (the "Motion"). (D.I. 48) For the reasons set forth below, the Court GRANTS the Motion.

**I.   BACKGROUND**

**A.   Factual Background**

The Court hereby incorporates its summary of the factual background set out in its May 9, 2024 Memorandum Opinion ("May 9 MO") regarding Defendants' Omnibus Motion to Dismiss and its May 31, 2024 Memorandum Opinion regarding the Individual Defendants' Motion to Dismiss. (D.I. 376 at 2-6; D.I. 386 at 2-5) Further factual background information relevant to the pending Motion will be set out below.

US WorldMeds, LLC was the original operating company for the Apokyn business relevant to this case; the entity was formed in 2001. (D.I. 16 at ¶ 41) From 2015 until 2020, USWM Enterprises, LLC was the parent company to US WorldMeds, LLC. (*Id.* at ¶¶ 40, 42, 44) In March 2020, US WorldMeds Partners, LLC was formed, and on April 28, 2020, SPI and

---

[1]   On March 3, 2023, the parties jointly consented to the Court's jurisdiction to conduct all proceedings in this case, including trial, the entry of final judgment and all post-trial proceedings. (D.I. 78)

US WorldMeds Partners, LLC entered into a Sale and Purchase Agreement ("SPA"); pursuant to the SPA, SPI would acquire the outstanding equity of USWM Enterprises, LLC, including the United States rights to Apokyn.  (*Id.* at ¶¶ 44, 57, 60, 154)  The day after the SPA was executed, the members of US WorldMeds, LLC incorporated USWM, LLC.  (*Id.* at ¶¶ 45, 46, 52)

On June 9, 2020, the transaction closed.  (*Id.* at ¶¶ 57, 154)  As a result of the sale, certain entities that were once part of the US WorldMeds business became subsidiaries of SPI, including US WorldMeds, LLC (which changed its name to MDD US Operations, LLC) and USWM Enterprises, LLC (which changed its name to MDD US Enterprises, LLC) (collectively, SPI, MDD US Enterprises, LLC and MDD US Operations, LLC will be referred to herein as the "Supernus Defendants").  (*Id.* at ¶¶ 43, 57)  The transaction resulted in an upfront payment to US WorldMeds Partners, LLC of $300 million dollars, and US WorldMeds Partners, LLC also has the potential to receive up to an additional $230 million dollars based on the achievement of certain regulatory and commercial milestones, such as passing certain sales thresholds for Apokyn.  (*Id.* at ¶ 60)

Additional relevant factual allegations will be discussed below in Section III.

**B.     Procedural Background**

Plaintiffs filed this action on October 3, 2022.  (D.I. 2)  On October 26, 2022, Plaintiffs filed the operative First Amended Complaint ("FAC").  (D.I. 16)  Plaintiffs assert the following counts of the six-count FAC against, *inter alia*, the Reorganized Entities:

- Count 1: Agreements that Unreasonably Restrain Trade, Violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, Section 3 of the Clayton Act, 15 U.S.C. § 14, New Jersey Antitrust Act, N.J.S.A. 56:9-3, (*id.* at ¶¶ 285-93);

- Count 3: Monopolization and Attempted Monopolization in the Alternative, Violation of Section 2 of the Sherman Act, 15

U.S.C. § 2, New Jersey Antitrust Act, N.J.S.A. 56:9-4(a), (*id.* at ¶¶ 304-17); and

- Count 6: Tortious Interference With Prospective Economic Advantage, (*id.* at ¶¶ 328-35).

On January 10, 2023, the Reorganized Entities filed the instant Motion. (D.I. 48) The Motion was fully briefed as of April 12, 2023. (D.I. 102)

## II.     LEGAL STANDARD

In the May 9 MO, the Court set out the familiar standard of review for a Rule 12(b)(6) motion to dismiss for failure to state a claim, as articulated by the United States Court of Appeals for the Third Circuit in *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-11 (3d Cir. 2009). (D.I. 376 at 8) The Court incorporates that standard into this opinion by reference, and will follow it herein.

## III.    DISCUSSION

With the Motion, the Reorganized Entities argue that they should be dismissed from this case because each of Plaintiffs' theories as to why they should be liable for the alleged anticompetitive conduct of their former affiliates are meritless. They make three primary arguments in this regard. The Court will address them in turn.

### A.     Plaintiffs Plead No Pre-Sale Wrongful Conduct by the Reorganized Entities

First, the Reorganized Entities argue that Plaintiffs fail to plead that they engaged in any wrongful conduct prior to the 2020 sale of the Apokyn business to SPI (or "pre-sale conduct")—because these companies did not exist much prior to that transaction. (D.I. 50 at 5)

In the FAC, Plaintiffs define the Reorganized Entities, collectively with Defendants US WorldMeds, LLC (pre-sale to SPI), USWM Enterprises, LLC (pre-sale to SPI), and Mr. Jones, Mr. Warren, Jr., Mr. van den Berg and Ms. Gullo, as the "US WorldMeds Defendants." (D.I. 16 at ¶ 56) With regard to the alleged wrongful pre-sale conduct, the FAC asserts that the US

4

WorldMeds Defendants committed multiple overt acts in furtherance of Defendants' anticompetitive scheme. These include: (1) establishing a limited distribution network with the specialty pharmacies selling Apokyn, in order to restrict access to the Apokyn drug and pen; (2) preparing and submitting sham citizen petitions to the United States Food and Drug Administration; and (3) negotiating and entering into a September 2019 Agreement with both Britannia and Apokyn pen supplier Becton, Dickinson and Company to foreclose Plaintiffs from access to Apokyn pens. (*Id.* at ¶ 58) All of this conduct occurred before 2020. The limited distribution network was in place in 2018, (*id.* at ¶¶ 99-107), the citizen petitions at issue were submitted in 2015 and 2019, (*id.* at ¶¶ 90, 111, 143), and the September 2019 Agreement was executed (as one might expect) in September 2019, (*id.* at ¶ 121).

So how do Plaintiffs assert that Reorganized Entities could be liable for events occurring before those entities ever existed? Plaintiffs do so by arguing that pursuant to the SPA, US WorldMeds Partners, LLC "expressly retains the liabilities of US WorldMeds." (D.I. 82 at 7) More specifically, Plaintiffs point to Section (6)(a)(iv)(a) of the SPA, which they say provides that US WorldMeds Partners, LLC "retained liability for claims arising out of 'liabilities and operation of the Company Group and its businesses prior to Completion' of the sale." (*Id.* (quoting D.I. 87, ex. 4 at 32-33))[2] The "Company Group[,]" in turn, is defined by the SPA to include, *inter alia*, US WorldMeds, LLC. (D.I. 87, ex. 4 at 7) According to Plaintiffs, this provision "is sufficient to raise an inference that the Reorganized Entities remain liable for US WorldMeds' conduct"—presumably even conduct that occurred before the Reorganized Entities existed. (D.I. 82 at 8)

---

[2]    It is undisputed that the Court can consider the SPA in resolving the instant Motion, as the SPA is integral to and explicitly relied upon in the FAC. (D.I. 50 at 3 n.1; D.I. 82 at 2 n.1; *see also, e.g.*, D.I. 16 at ¶¶ 60-61, 154)

The Court agrees with the Reorganized Entities that this provision does not appear to be relevant to Plaintiffs' claims against Defendants. (D.I. 102 at 2) Plaintiffs ignore that Section (6)(a)(iv)(a) is all about the claims that *SPI* may bring against US WorldMeds Partners, LLC. Indeed, Section 6(a) begins by stating that "[s]ubject to the limitations set forth in Schedule 6, *Purchaser [SPI]* may bring any claims *it may have* against Seller [US WorldMeds Partners, LLC]" as are further set out in that subsection (including in Section 6(a)(iv)(a)). (D.I. 87, ex. 4 at 32 (emphasis added)) Plaintiffs fail to explain how this language amounts to a statement that the Reorganized Entities retain liability for claims regarding pre-sale conduct brought by entities like *Plaintiffs*. (D.I. 102 at 1-2); *cf. In re Publ'n Paper Antitrust Litig.*, Civil Action No. 3:04md1631 (SRU), 2013 WL 3155371, at *3 (D. Conn. June 20, 2013) (denying plaintiffs' motion to substitute or join the former parent company ("SEO") of the defendant ("SENA") as a defendant, where plaintiff argued that SEO assumed direct liability for SENA's alleged anticompetitive misconduct under the terms of a Sales Purchase Agreement ("SPA"), and concluding that: (1) "given SENA's separate corporate existence as SEO's subsidiary prior to . . . 2007 [], SEO was never directly liable for SENA's alleged misconduct in the first place, and therefore had no liability to []retain[;]" and (2) nothing in the SPA indicated that SEO affirmatively assumed liability for SENA's alleged anticompetitive activity) (internal quotation marks omitted).[3]

---

[3] In their briefing, the Reorganized Entities also appeared to be concerned that Plaintiffs were additionally alleging that certain warranties made by US WorldMeds Partners, LLC to SPI in the SPA—including a warranty that the US WorldMeds entities had not engaged in antitrust violations (and a statement about US WorldMeds Partners, LLC's obligation to indemnify SPI for breaches of those warranties)—granted *Plaintiffs* a cause of action under the SPA. (D.I. 50 at 5-6; D.I. 102 at 1-2; *see also* D.I. 16 at ¶¶ 60-61) Plaintiffs retort that they are not asserting a contract claim under the SPA, but instead are alleging that "USWM Partners[, LLC] is a mere façade of the USWM enterprise that has committed antitrust violations and reorganized its corporate structure to evade liability." (D.I. 82 at 8) In light of Plaintiffs'

6

For the above reasons, the FAC does not plausibly assert that the Reorganized Entities are liable for any pre-sale anticompetitive conduct.

**B.     Plaintiffs Plead No Post-Sale Wrongful Conduct by the Reorganized Entities**

Turning next to post-sale conduct, the FAC alleges that the Reorganized Entities "have continued to conspire with the Supernus Defendants following the sale of Apokyn[] by sharing in a conscious commitment to the unlawful objective of excluding generic competition in order to continue to share in the monopoly profits generated by Apokyn[] and received pursuant to the continuing obligations set forth in the" SPA. (D.I. 16 at ¶ 59)  To this, the Reorganized Entities argue that they cannot be liable for their post-sale conduct.  This is so, they assert, because merely having a financial interest in the success of the Apokyn business cannot suffice to demonstrate participation in the alleged antitrust conspiracy, nor does it make the holder of such a financial interest liable for another company's conduct. (D.I. 50 at 7-8)

Plaintiffs respond by arguing that the Reorganized Entities' position ignores the substance of the FAC's allegations.  According to Plaintiffs, they are alleging that the Reorganized Entities are liable for post-sale conduct because of *both*:  (1) their continued agreement to split "monopoly profits" with other Defendants and (2) their "continued obligations to support Supernus pursuant to the SPA[.]" (D.I. 82 at 8-9)  With regard to the latter issue (i.e., the allegations about continued obligations to support Supernus), Plaintiffs reference a portion of the SPA that describes a "Transitional Services Agreement"; pursuant to this agreement, US WorldMeds Partners, LLC and any subsidiary thereof agreed to provide "certain services" to SPI.  (*Id.* at 9 (citing D.I. 87, ex. 4 at 22))

---

response, the Court need not address this SPA-related argument further, and will take up Plaintiffs' "mere façade" assertion below.

7

As an initial matter, the Court notes that in attempting to argue that post-sale liability is demonstrated *both* by the Reorganized Entities' ongoing financial interest in Apokyn *and* the entities' continuing obligations to support Supernus under the SPA, Plaintiffs seem to be acknowledging that allegations regarding an ongoing financial interest alone would not be sufficient. (*Id.* (Plaintiffs noting that their argument is that the Reorganized Entities' continued obligations to support SPI "along with" their ongoing financial interest in maintaining the alleged monopoly is sufficient to deny the Motion on this ground))  But to the extent that the Court is wrong about Plaintiffs' intentions here—and to the extent that Plaintiffs *are* arguing that "taking a cut of monopoly profits" alone is sufficient to support an inference that the Reorganized Entities engaged in anticompetitive activity—Plaintiffs' cases do not support such a conclusion. (*Id.*)  As the Reorganized Entities point out, all four of the cases that Plaintiffs cite in this regard involved more than just that—that is, they all dealt with circumstances in which "payments [were made] to induce the recipient of the payment to restrain competition, making the payment essentially part of the alleged violation." (D.I. 102 at 4)

For example, in *In re Surescripts Antitrust Litig.*, 608 F. Supp. 3d 629 (N.D. Ill. 2022) (*cited in* D.I. 82 at 9), the defendants at issue were not just earning a share of the monopoly profits, but they had also entered into contracts compelling them to "sign their customer bases onto Surescripts' loyalty pricing agreement—an agreement the Pharmacies paint as an illegal exclusive deal." 608 F. Supp. 3d at 637, 650.  In *Fed. Trade Comm'n v. Vyera Pharms., LLC*, 479 F. Supp. 3d 31 (S.D.N.Y. 2020) (*cited in* D.I. 82 at 9), the complaint alleged that defendants entered into contracts with certain alleged co-conspirator distributors whereby the distributors received a cut of the sales of the drug at issue, and were required to sell the drug only to certain purchasers and limit the quantity of drug that was sold; the court concluded that these restrictive

8

provisions "made it obvious to Vyera's commercial partners that they were agreeing to engage in anticompetitive conduct by executing those agreements." 479 F. Supp. 3d at 39-40, 47-48.  In *Amphastar Pharms., Inc. v. Momenta Pharms., Inc.*, 297 F. Supp. 3d 222 (D. Mass. 2018) (*cited in* D.I. 82 at 9), the complaint alleged that the defendants had entered into a collaboration agreement whereby one ("Momenta") granted another ("Sandoz") an exclusive license to a patent and required Sandoz to make payments to Momenta "for the privilege of remaining the sole source of generic enoxaparin in the United States[.]" 297 F. Supp. 3d at 225, 231.  And finally, in *In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig.*, CIV. A. NO. 16-5073, 2017 WL 3967911 (E.D. Pa. Sept. 8, 2017) (*cited in* D.I. 82 at 9), the complaint alleged that the defendant that received royalty payments also came up with a strategy with another defendant to engage in anticompetitive conduct regarding a drug product, and that it manufactured the drug at issue. 2017 WL 3967911, at *3, *21.

      Therefore, the caselaw indicates that in order to sufficiently allege that the Reorganized Entities engaged in actionable misconduct, the FAC needed to assert that these Defendants participated in some type of wrongful conduct *in addition to* simply receiving (or having the contingent right to receive) certain monies flowing from others' anticompetitive acts.  And the problem for Plaintiffs is that the FAC does not do this.  That is, Plaintiffs plead no facts alleging that the Reorganized Entities *themselves* engaged in anticompetitive conduct.  And to the extent that the existence of the Transitional Services Agreement is supposed to have something to do with alleged post-sale anticompetitive conduct, the FAC does not explain why that is so.  (D.I. 102 at 3)  The only allegation from the FAC that Plaintiffs cite to in support of their argument to the contrary is paragraph 60, which states as follows:

> 60.  Defendant US WorldMeds Partners, LLC is the counterparty to Supernus on the April 28, 2020, Sale and Purchase Agreement.

> The agreement involved an upfront payment to US WorldMeds Partners, LLC of $300 million dollars. Defendant US WorldMeds Partners, LLC retains a substantial financial interest in the continued exclusionary conduct and maintenance of Supernus's monopoly over the injectable apomorphine market and thus a commitment to a common scheme designed to achieve an unlawful objective. According to the terms of its sale to Supernus, US WorldMeds Partners, LLC may receive up to $230 million dollars in contingent consideration based on regulatory and commercial milestones, such as achieving U.S. sales thresholds for Apokyn®. Upon information and belief, Defendant US WorldMeds Partners, LLC, and thus its overlapping individual members with USWM LLC, have retained certain liabilities related to the conduct of the Apokyn® business prior to its acquisition by Supernus. Additionally, upon information and belief, US WorldMeds Partners, LLC agreed to indemnify Supernus with respect to the representations and warranties that it made in the Sale and Purchase Agreement.

(D.I. 16 at ¶ 60 (*cited in* D.I. 82 at 9)) This paragraph says nothing about any Transitional Services Agreement or any related "continued obligations" on the part of the Reorganized Entities to support SPI by engaging in anticompetitive conduct. Nor is the nature of what any such obligations would be otherwise clear from the record.

For all of these reasons, Plaintiffs have failed to sufficiently allege liability on the Reorganized Entities' part regarding post-sale conduct.

### C. Plaintiffs Fail to Sufficiently Plead that the Reorganized Entities are Functionally Indistinguishable From Each Other and/or US WorldMeds, LLC

Finally, the Reorganized Entities take on Plaintiffs' assertion that the Reorganized Entities are "functionally indistinguishable from one another and US WorldMeds" such that the former entities should be liable for the misconduct of the latter. (D.I. 82 at 2; *see also* D.I. 50 at 2, 8-13; D.I. 102 at 4-7)

Plaintiffs first respond by asserting that "[u]nder traditional principles of successor liability, the Reorganized Entities are mere continuations of US WorldMeds that inherited its

10

liability as a result." (D.I. 82 at 9) In this regard, generally a purchaser of assets does not automatically inherit the liabilities of the seller simply by purchasing those assets; successor liability is an exception to this general rule. *Sugartown Worldwide LLC v. Shanks*, 150 F. Supp. 3d 470, 476 (E.D. Pa. 2015). The "mere continuation" theory of successor liability looks to whether "the new corporation is merely restructured from the old[.]" *Id.* To determine whether a succeeding entity is a mere continuation of its predecessor, courts consider factors including, *inter alia*:

> (1) continuation of the enterprise of the seller corporation so there is continuity in management, personnel, physical location, assets and general business operations; (2) continuity of shareholders resulting from the purchasing corporation paying for the acquired assets with shares of its own stock, this stock ultimately coming to be held by the shareholders of the seller corporation so that they become a constituent part of the purchasing corporation; (3) the seller corporation ceases its ordinary business operations, liquidates, and dissolves as soon as legally and practically possible; and, (4) the purchaser assumes the obligations of the seller ordinarily necessary for the uninterrupted continuation of normal business operations of the seller.

*Id.* at 476-77; *see also Magnolia's at Bethany, LLC v. Artesian Consulting Eng'rs*, C.A. No. S11 C-04-013-ESB, 2011 WL 4826106, at *3 (Del. Super. Ct. Sept. 19, 2011) (noting similar factors relevant to the mere continuation theory under Delaware law). The continuation theory of successor liability is narrowly construed pursuant to Delaware law. *Marnavi S.p.A. v. Keehan*, 900 F. Supp. 2d 377, 397 (D. Del. 2012); *see also Funai Elec. Co. v. Daewoo Elecs. Corp.*, 616 F.3d 1357, 1379-82 (Fed. Cir. 2010) (assessing the question of successor liability in a case involving federal patent claims by looking to state law).[4] In Delaware, mere continuation

---

[4] Neither party addressed what forum's laws would apply to Plaintiffs' "mere continuation" theory of successor liability. (D.I. 82 at 9-11; D.I. 102 at 4-5) The Court will assume *arguendo* that Delaware law applies since US WorldMeds, LLC was formed in Delaware and the Reorganized Entities are organized under Delaware law, and the SPA contains a

requires the new company to be the same legal entity as the former. *AJZN, Inc. v. Yu*, Civil Action No. 13-149 GMS, 2015 WL 331937, at *15 (D. Del. Jan. 26, 2015); *Fountain v. Colonial Chevrolet Co.*, 1988 WL 40019, at *8-9 (Del. Super. Ct. Apr. 13, 1988).

The Reorganized Entities retort that Plaintiffs did not plead this "mere continuation" theory of successor liability in the FAC. (D.I. 102 at 4) The Court agrees. The FAC does not use the term "successor[,]" nor the phrases "successor liability" or "mere continuation." And so it does not make it clear that Plaintiffs are actually asserting this theory of liability. It seems unfair for Plaintiffs to try to utilize such a theory to keep the Reorganized Entities in the case when Plaintiffs failed to explicitly provide notice of that theory in the operative complaint. *See, e.g., Lindenberg v. Arrayit Corp.*, Civil Action No. 14-833 (SRC), 2014 WL 3854078, at *4 (D.N.J. Aug. 6, 2014) (finding that the plaintiff's reliance on a veil piercing theory against defendant failed where, *inter alia*, that theory was not pleaded in the operative complaint, and because "a pleading may not be amended through briefing on dispositive motions"); *see also Jeter v. Century 21 Bob Capes Realtors, Inc.*, C.A. No. 3:11-CV-627-CMC, 2011 WL 2581415, at *5 (D.S.C. June 29, 2011).

That said, even if the FAC could be said to hint at a successor liability theory, the Court also agrees with the Reorganized Entities that such a theory is insufficiently supported by the FAC's allegations. (D.I. 102 at 4-5 & n.3) The FAC does not plausibly establish that the Reorganized Entities are "merely restructured" from US WorldMeds, LLC—such that the Reorganized Entities are, in essence, the same legal entity as was US WorldMeds, LLC. *See Sugartown*, 150 F. Supp. 3d at 476. While there are some allegations in the FAC about how

---

Delaware choice-of-law provision. (D.I. 16 at ¶¶ 41, 44-45; D.I. 87, ex. 4 at 43); *see, e.g., Energy Intel. Grp., Inc. v. Cowen & Co., LLC*, 14 Civ. 3789 (NRB), 2016 WL 3939747, at *11 (S.D.N.Y. July 15, 2016).

there is continuity in management, personnel and physical location as between the former US WorldMeds, LLC and USWM, LLC, (D.I. 16 at ¶¶ 46-47, 51-52), there is no allegation that the companies have essentially merged together into one.  US WorldMeds, LLC still exists as a separate entity (now called MDD US Operations, LLC).  And it is that separate entity (not the Reorganized Entities) that is the "continuation of the [relevant Apokyn] enterprise of the seller corporation[.]" *Sugartown*, 150 F. Supp. 3d at 476; *see also* (D.I. 102 at 5).  To that end, the FAC alleges that US WorldMeds, LLC did not "cease[] its ordinary business operations, liquidate[], and dissolve[]"; instead, it is currently a subsidiary of SPI and it "continues to operate the Apokyn[] business post-sale to Supernus."  (D.I. 16 at ¶¶ 41, 57); *see also Sugartown*, 150 F. Supp. 3d at 476.  Indeed, for this reason, the USWM, LLC website does not reference or list Apokyn (nor other products acquired by the Supernus Defendants).  (D.I. 16 at ¶ 48)

In sum, the FAC makes clear that the Reorganized Entities and US WorldMeds, LLC/MDD US Operations, LLC currently exist as separate entities.  And therefore Plaintiffs have not alleged sufficient facts to support a "mere continuation" theory of liability.  *Cf. Hamill v. Twin Cedars Senior Living Ctr.*, Civil No. 3:20-CV-231, 2020 WL 7329228, at *7 (M.D. Pa. Nov. 23, 2020) (concluding that the plaintiff failed to allege sufficient facts to support an inference of successor liability under the mere continuation theory pursuant to Pennsylvania law where, *inter alia*, the plaintiff "does not allege the existence of a single corporation following the transfer"), *report and recommendation adopted*, 2020 WL 7323870 (M.D. Pa. Dec. 11, 2020); *Magnolia's at Bethany, LLC*, 2011 WL 4826106, at *3 (concluding that the plaintiff failed to state a claim of continuation liability pursuant to Delaware law, where the complaint did not

allege "sufficient facts to support a finding that Artesian is the same legal person as Meridian") (internal quotation marks omitted).

Finally, the Reorganized Entities contend that the FAC fails to plead sufficient facts to support an "alter ego" theory of liability. (D.I. 50 at 8-13; D.I. 102 at 6-7) Here again, the Court agrees.

A well-settled general principle of corporate law that is "deeply ingrained in our economic and legal systems[, is] that a parent corporation . . . is not liable for the acts of its subsidiaries." *United States v. Bestfoods*, 524 U.S. 51, 61 (1998) (internal quotation marks and citations omitted). Piercing the corporate veil is an "extraordinary remedy." *Round Rock Rsch. LLC v. ASUSTeK Comput. Inc.*, 967 F. Supp. 2d 969, 978 (D. Del. 2013) (internal quotation marks and citation omitted). That said, courts at times have done so. One such circumstance is when one entity is found to be the alter ego of another entity. *See, e.g.*, *Galderma Lab'ys, L.P. v. Medinter US, LLC*, Civil Action No. 18-1892-CFC-CJB, 2019 WL 13114421, at *4 (D. Del. Oct. 25, 2019). The Third Circuit[5] has held that the corporate veil may be pierced pursuant to the alter ego theory: (1) when a court finds that there is a fundamental lack of corporate separateness between the entities; and (2) where this situation also presents an element of either fraud, injustice, or unfairness in the use of the corporate form. *See Trs. of Nat'l Elevator Indus. Pension, Health Benefit & Educ. Funds v. Lutyk*, 332 F.3d 188, 194 (3d Cir. 2003); *Bristol-Myers Squibb Co. v. Aurobindo Pharma USA Inc.*, C.A. No. 17-374-LPS (CONSOLIDATED), C.A. No. 17-379-LPS, 2018 WL 5109836, at *4 (D. Del. Oct. 18, 2018). In the end, in order to succeed on an alter ego theory of liability, a plaintiff must establish that in all aspects of the

---

[5] Both parties cite to federal common law as set out by the Third Circuit in articulating the applicable standard for establishing alter ego status. (D.I. 50 at 8-9; D.I. 82 at 11) The Court will utilize that case law here.

business, the relevant corporate entities "actually functioned as a single entity and should be treated as such." *Pearson v. Component Tech. Corp.*, 247 F.3d 471, 485 (3d Cir. 2001).

To determine whether there is a lack of corporate separateness, "[t]he Third Circuit considers multiple non-exclusive factors . . . including":

> [G]ross undercapitalization, failure to observe corporate formalities, nonpayment of dividends, insolvency of [subsidiary/other] corporation, siphoning of funds from the [subsidiary/other] corporation by the dominant stockholder, nonfunctioning of officers and directors, absence of corporate records, and whether the corporation is merely a facade for the operations of the dominant stockholder.

*Bristol-Myers Squibb Co.*, 2018 WL 5109836, at *4 (quoting *Pearson*, 247 F.3d at 484-85). No single factor is dispositive, and in considering whether veil piercing is appropriate, a court must assess the totality of the circumstances. *Trinity Indus., Inc. v. Greenlease Holding Co.*, 903 F.3d 333, 365 (3d Cir. 2018). The presence of a number of these factors can also be sufficient to establish that an element of injustice or fundamental unfairness is at play. *See Trs. of Nat'l Elevator Indus. Pension*, 332 F.3d at 194.

The FAC does not make the substance of Plaintiffs' alter ego theory all that clear. It only uses the phrase "alter ego" once—when it alleges that "*US WorldMeds Partners, LLC* has the same managers as *Defendant USWM, LLC* and *acts as the alter ego*, agent, and mere instrumentality *of Defendant USWM, LLC*." (D.I. 16 at ¶ 53 (emphasis added); *see also id.* at ¶ 55 (alleging that the Reorganized Entities commingle the assets and operations of their business))

If *this* is the type of alter ego assertion that Plaintiffs meant to plead (i.e., that U.S. WorldMeds Partners, LLC and USWM, LLC are alter egos) it would not help Plaintiffs rebut the instant Rule 12(b)(6) challenge. That is because, as noted above, the FAC does not sufficiently

allege that either US WorldMeds Partners, LLC or USWM, LLC are liable for any misconduct at issue. And so in order for an alter ego showing to really help Plaintiffs here, they would have to plead facts sufficiently demonstrating that one or both of the Reorganized Entities are the alter ego of *US WorldMeds, LLC*—such that the Reorganized Entities should be held liable for the alleged wrongful conduct of *US WorldMeds, LLC* (conduct that *is* adequately set out in the FAC).

But even if Plaintiffs meant to set out *that type* of alter ego claim in the FAC, they would have failed. As explained above, the FAC's allegations do not show that, at present, either of the Reorganized Entities and US WorldMeds, LLC operate or function as a single entity. Indeed, post-sale, these entities exist in "entirely different corporate famil[ies.]" (D.I. 102 at 6) Although the FAC alleges that USWM, LLC currently uses the same website, logo, headquarters, employees and certain of the same products (aside from those sold to SPI, like Apokyn) as US WorldMeds, LLC *used to prior to its sale*, (D.I. 16 at ¶¶ 47, 50-52, 54), that does not demonstrate that the entities are *currently* alter egos (or have been since the sale). (D.I. 102 at 6) Nor does the FAC allege that corporate formalities between either of the Reorganized Entities and US WorldMeds, LLC were unobserved during the brief 2020 timeframe in which the Reorganized Entities were part of the same corporate family as US WorldMeds, LLC (i.e., before the sale closed in June 2020). (D.I. 50 at 9; D.I. 102 at 6)

For these reasons, the FAC fails to plead facts supporting an alter ego theory of liability with respect to the Reorganized Entities.

## IV. CONCLUSION

For the foregoing reasons, the Court GRANTS the Motion.

An appropriate Order will issue.